On April 12, 2007, Jimmy Ferris died during a traffic stop that happened in Rolla, Missouri, on a parking lot of the Taco Bell restaurant. Mr. Ferris was involved with three sheriff's deputies, Deputies Pinson, Deputies Manley, and Deputy Winn. Deputies Pinson and Manley were the officers who pulled over Mr. Ferris for running a red stoplight and they called to assist them Officer Winn, who was a canine officer with special training, and they all arrived there at the scene. Officer Pinson asked Mr. Ferris for his license. Mr. Ferris complied, was asked to get out of his pickup truck. Mr. Ferris complied. Winn walked the dog around the pickup truck and told Ferris to get out of the pickup truck. Mr. Ferris complied. The dog lit on the pickup truck and they asked Mr. Ferris if they could search the pickup truck. Mr. Ferris said sure, and they did, found no contraband. Officer Pinson and Manley were in their patrol car writing the ticket up for running the red light while Officer Winn was conducting this search with Mr. Ferris. Winn instructs Ferris to go to the back of the pickup truck and empty his pockets. Mr. Ferris starts to do that. Officer Winn stops him and pats him down and searches his one pocket, finds a pocket knife, and Mr. Ferris has him take it out of his pocket. Winn instructs Ferris to put his hands on the tailgate. He does, and at this point something unusual happens. Officer Winn forces Mr. Ferris's face and chest down onto the tailgate and a struggle ensues. There are three witnesses at the Taco Bell, employees there that were less than a few feet away and witnessed the whole thing. Officers Pinson and Manley did not because they were in the patrol car, but they saw the struggle in progress and they gave aid to Officer Winn. And there was also a civilian right along with Officer Winn who participated in this fray. They struck him. They forced him to the pavement. They used pepper spray on him. They finally got handcuffs on Mr. Ferris because he was pushing up off of the pavement and they got him handcuffed. Shortly thereafter he vomited and died. At this point I think the Sheriff's Department thought there might be a lawsuit coming. So they called the Missouri Highway Patrol to conduct an investigation into this and they assumed jurisdiction over the scene thereafter. The patrol officers asked the participating sheriff's officers to write reports, which they did and presented to the patrol. And the patrol officers also interviewed the three witnesses. They did not take recorded statements, but they made field notes, which they later destroyed after they made notes of what they thought was significant. An autopsy was also conducted by a state's witness, a coroner in the city of St. Louis, who frequently testifies for the city and the state. I'm sure she knew a trial might be coming, too. She did a thorough investigation and her investigation revealed that Mr. Ferris had an enlarged heart, which was due, in her medical opinion, to hypertension, high blood pressure that he had, which she admitted and testified in the trial is a common condition and that he probably didn't know about that. She also screened him for every form of illicit drug that she could manage on a panel. And what comes back on one of the screens is less than one ten-millionth of a milliliter parts of some form of methamphetamine. There are several types, but it's not identified with specificity. Okay, let me interrupt a minute. Sure. You tried this to a jury, correct? We did. Did all this evidence come in at the jury? It did. And your complaint on appeal is that they got to use Wynn's deposition, right? Correct. Now, what was Wynn's deposition? Who scheduled it? Was this a discovery deposition? Did you schedule it? Who took the deposition? Before I even personally got into this case, it was being managed by my partner, Ty Smith, and one of our associates, I believe, took the deposition, a former prosecuting attorney named Travis O'Neil. So your office took the deposition on behalf of Ms. McDowell, correct? Correct. Now, I know from my experience that there's discovery depositions and there's trial depositions, so I assume you were doing more of a discovery deposition. Is that right? Well, that's what it was. And as the court knows in federal court, live testimony is required. It's different in the courts of the state of Missouri. Depositions can be used for any purpose in Missouri courts. Illinois courts are different, and they have what you call discovery depositions. This would have been what you would understand to be as a discovery deposition. The plaintiffs intended and fully expected that Officer Wynn would show up at the trial, and so did his counsel. My partner, as I said, conducted the investigation. He asked a toxicologist. Well, the coroner, the pathologist, said that, in her opinion, what caused Mr. Ferris' death was his enlarged heart, hypertension, and exacerbated by the presence of this methamphetamine and the struggle that ensued. The combination of those events were the reasons that she said in her report and in her testimony at trial caused or contributed to cause Mr. Ferris' death. In summary, he would not have died but for the struggle, and she testified specifically to that, too. My partner also interviewed the witnesses. The witnesses all told us that they did not say what the Highway Patrol. Hey, but all that came in at trial. That's true. So how are you, I mean, there's a legal matter whether the deposition comes in or not, and that, first of all, I assume that's under abuse of discretion. Is that right? That's true. That's the standard. Okay. So the question then is, under an abuse of discretion standard, how did the district judge abuse his discretion in allowing that deposition, and how were you prejudiced because you got all the other evidence you wanted in, including these three witnesses that were, to a certain degree, inconsistent with what the police officer's deposition said? You're asking me why was there prejudice? Right. Okay. Yes, there was prejudice. The ultimate issue in this case, in fact, really the only issue in this case, ultimately centered around this one small confrontation, that is whether or not Officer Wynn had reasonable cause to strike Mr. Ferris down and cause this affray. It was the theory of the plaintiffs that it triggered his heart attack and that he was struggling to keep himself alive because of this sudden affray that was brought on for no good reason by Officer Wynn. However, Officer Wynn testified, gave a report, and testified consistent with his report that he had cause. He said that what Mr. Ferris did was he made a fist when he ---- Okay. I realize that. But if you had had him there live, how would it have been better? How would your case have improved if he were there live? Assuming my assumption would be is he's going to say the same thing he said in his deposition and in his report. I think that's a reasonable assumption, Your Honor. What did you think you were going to get out of him if he were there live? The point of this trial was a confrontation with Officer Wynn. The point of the lawsuit and the trial was not a confrontation with his words. It was with him. As the judge, I'm sure, knows that credibility of witnesses is not weighed by the cold words of a transcript or a report. Otherwise, we'd have trials by report, but we don't. And the federal courts has rules about that, and that's why the rule on hearsay, frankly, is in place. What did you think you were going to get on credibility if you had him there live? Was it on his looks, his demeanor? Did you have some evidence that you'd held back that you wanted to cross him on? What was it you thought you were going to get out of it? And you're asking me because I'm the trial lawyer. That's right. Right. Well, Judge, I wish I could tell you the answer to what I might have thought, but I did not take his deposition. And contrary to what the order said, the order dismissing the motion to dismiss said that this was a videotaped deposition. It was not. So I was never able to see Officer Wynn testify, hear him testify. So I personally cannot tell you what I would have expected other than a confrontation that is dramatically juxtaposed between the eyewitnesses and him. Did any of the lay witnesses see what Wynn was doing? If I understand the facts, the other officers were not watching when the actual scuffle started. Did the Taco Bell witnesses see that? Yes, every one of them. And every one of them said that Mr. Ferris was completely compliant. They did not see a fist or any aggressive gestures until the slamming of Mr. Ferris' body down to the tailgate and a struggle ensuing. Where they said they heard him say, I cannot breathe, I can't breathe. And they, and I believe a reasonable person, would understand that to be that he was in distress. See, I don't understand. You've got three disinterested witnesses saying all that. I don't know how it gets any better than that. I don't know what having him there, the district court says that not having him there was more of a disadvantage to the defendants than it was to the plaintiff. And I'm trying to have you explain to me why that's wrong. About, it seemed to me in common sense, it seems that you had an advantage because you had these three disinterested witnesses who were disputing what the officer said about how it happened. Well, Judge, I don't agree with you or the trial court that that's the only inference that can be drawn by the absence of a witness when his testimony is being read by a lawyer to them, sworn testimony in a courtroom. The prejudice is the denial of a confrontation of the witnesses and their testimony so that the jury can decide and weigh credibility. I can't tell you what would have happened but for the denial of this confrontation. From the briefs I read in the district court opinion that you were allowed to argue that in closing, that his absence, and I didn't read the transcript, but I assume you did argue that there was some sort of presumption or something that could go with his absence. Did you make such an argument? I did. That argument was not denied to me and I took the opportunity. Did you beat it? I've tried a case or so and that argument was made and that argument is being made in essence to you right now because I told the jury you were not allowed to see this man testify and how it related to the testimony of eyewitnesses. So you were denied the opportunity to know. It's a form of a negative inference but it's precisely the point on appeal right now. 40 seconds. I could say some more stuff but I think I won't because I'll just get started into things. Well, I'll give you a minute and rebuttal. Okay, thanks. Okay, thank you. Morning, Mr. Dunn. Morning, sir. Good morning. May it please the court. Peter Dunn appearing for, among others, Defendant Mark Winn. When the trial of this case was set to begin a year ago last March, I learned two days before the trial that Deputy Winn was not going to be making the trip from Afghanistan to St. Louis to appear for the trial. The morning of the pretrial conference, the day the trial began, I advised the trial court and Mr. Turley of that fact and consideration began to be undertaken about how that was going to be handled. The parties talked about the fact that a deposition had been given in the case. Ironically, there were two pieces of litigation that were pending at the same time involving the same law firms in which Deputy Winn was a party in each of those separate cases. In a different case, not McDowell, but a different case, Deputy Winn had actually returned from Afghanistan to Missouri to give a deposition, in this case involving a different plaintiff who was also represented by Mr. Turley's office. In the course of that deposition, and that is the deposition that's referred to in the court's order denying the motion for new trial, that Deputy Winn had returned to Missouri in 2011 to give a deposition, in the course of which he mentioned, I have a two-year contract to work in Afghanistan as a K-9 dog handler. I only mention that because the fact of Deputy Winn's employment in Afghanistan as a contractor for the United States Army was not unknown to the plaintiffs. They did know that Deputy Winn was engaged in that employment, and while I was aware of the possibility that Deputy Winn would not return to appear for the trial, I didn't know for a fact that he wasn't in town with the date we had set up to meet to discuss the trial, the Saturday before the Monday the trial began. And so I considered it, frankly, a tremendous disadvantage to myself that Deputy Winn was not present, and the idea that his deposition might have to be used in lieu of his live testimony really didn't come up until the morning the trial began, and the parties in the court all discussed whether or not that might happen and how it would be done. Is there anything, I didn't see anything in the record that explained why it was that nobody knew until the last minute, and how that plays into whether it's exceptional circumstances, whether he procured his own absence. If everyone's thinking he's showing, how do we, what did the district court do with that? Everyone was thinking that he was showing, and I didn't have any prior indication that he wasn't coming until literally it happened. I had mentioned when the trial began that there was a case the year before that I had tried a case where a client of mine who formerly was in law enforcement but had left that position and was working in a foreign country didn't appear for the trial, and I mentioned in that circumstance that we had used the deposition of the party, and it was a poor substitute for his live testimony, but it's what there was. The exceptional circumstances I think that the judge considered were, among others, the following. Number one, he accepted my representation that that's where the party was, that his absence from the trial was not the subject of procurement, as I read and define that term, in the sense that it was something that was, as I looked it up, obtained by special effort or wrongfully caused or deliberately absent himself from the trial for some improper purpose. I didn't think the court found that to be the case at all. But there wasn't really any evidence either way, right, about why? I guess the question is, was there any evidence in the record as to why he didn't show up, other than, well, he's in Afghanistan working? In terms of evidence, that's an interesting that you put it that way. The answer to that would be no. There were simply representations that were made by me about my understanding of what he was doing, which was that he was providing this contracting service, training canine dogs for the United States Army in Afghanistan, that he had a two-year contract that overlapped into the time period that the trial was to take place. That was mentioned in this prior deposition that I referenced. So what you represented was when he came back the first time, he wasn't under this canine contract with the U.S. Army. He was on leave from it, was my understanding. Oh, because he's in contract with the U.S. government, it must be that he can't return? Well, I knew from Skype conversations I had had with the fellow that he was in Afghanistan, at least that's where I believed he was when I had these contacts with him, and I knew the duration of this contract extended beyond the period of the trial. But despite all of that, he had represented to me that he would use up leave or try to get permission or get someone to substitute for him or whatever he was necessary to do to make the long and the impression I got arduous task of trying to get back here from the place where he was stationed. But, you know, at the end of the day, I think the court looked at Rule 32A-4 and decided that there were two reasons why. Exceptionally, he was in Afghanistan, therefore in a foreign country and more than 100 miles away from the court. And two, under the unique facts kind of presented here, he did have an interest in the proceedings. He hadn't avoided the proceedings. He had appeared for his deposition. He was involved in the defense of the case, and that his absence from the trial was not for an improper purpose but was for a legitimate business purpose. And then finally, the fact that his absence from the trial, frankly, did not operate to his advantage at all. I think the reasonable presumption would be the opposite, that a party's absence from their own trial, frankly, operates to their tremendous disadvantage. There's nobody who wanted him there more than I did, and no one who felt the fact that he wasn't there was potentially going to be harmful to him more than I did. I was positive that the risk was great that a jury might hold his failure to appear against him. Let me ask you a couple procedural questions. Yes, sir. Was this trial preset rather than, you know, the kind of trial sometimes we have, they call you on a Friday and say come in Monday morning? No, sir. We knew for months ahead of time what the trial date was. Okay. And had you told Mr. Wynn or Officer Wynn this? I had. He did know about the trial date. And as I said, our pretrial discussions had all been to the effect that it would create a hardship for him, but that he would be here. Was any effort at all made? You apparently had a correspondence with him by Skype. Any effort made to use Skype and take his deposition in Afghanistan? The lack of notice, advance notice, was extremely of the notice we had of his lack of appearance was a very short duration. I did not. When our communications with him about his inability to appear actually were confirmed finally by an e-mail that we received as opposed to by a telephone conversation or a Skype communication, and so the difficulty or the challenge presented about trying to find some alternative means of presenting his testimony kind of arose for the first time at the pretrial conference. At that time, the parties, both the plaintiff and the defendant, suggested that we'd look at his deposition and see what parts of it might be read. And when we finished through the plaintiff's case and they didn't use it and I announced my intention to use it in the defendant's case, that's when the plaintiff said that they intended to object to it on the reasons that were stated. Now, the district court offered the plaintiff a continuance. Is that correct? Again, that happened during the pretrial conference, and it was just in the form of a brief statement that do you want the case continued for this reason. I read that in the transcript. I didn't see in there any either offer by the judge or request by the plaintiff to just sever Officer Wynn out of this, try the rest of it, save his for another day. Was that ever discussed? I have no memory of that, but as I said, if I didn't say it, I meant to say it, that the incident giving rise to the claim was almost six years prior to the date of the trial, and I think all the parties, frankly, were anxious that the matter be tried. The idea that it might be continued or that some part of it would be separated out, I don't recall that getting discussed. What I recall is, and to Mr. Turley's credit, he was brought in by counsel for plaintiff near the end of the proceedings, and our communications on the subject were we're going to try this case because it had been pending for a long time. There are health problems with plaintiff's other attorney. It was stayed for a period of time. Five years is a long time for a matter to pend in the district court, and we were all concerned about our desire that the matter be finally heard. I just have one more question on his non-appearance. You just found out a day or two before the trial. Yes, ma'am. Why couldn't he come? Was that part of the case? The issue that was communicated to me was the amount of time off that he had and the duration of time it would take to leave the place where he was. I'm sorry, I'm not conversant with the geography of his location, but he estimated that it was a four- to five-day trip from the place where he was to get to and make flight arrangements and get back to St. Louis from the moment he started leaving, so he said. And so by the time he communicated to me that he was not coming, the opportunity to get here in time for the trial had already passed. In other words, he was going to have to have left two to three days ahead of the day I heard about it for the first time, according to what he had told me, in order to get here in time. And we're talking about a lot of things that the record I know are completely silent about. What ended up happening in the district court was I said, this fellow's in Afghanistan, the other side knows he's in Afghanistan, he was on leave the last time he was in town to give a deposition in this other case. The fact that he is in this distant location, had left the employment of the Phelps County Sheriff's Office, was known to everyone, he had an interest in the proceedings, he had given this lengthy deposition, 160-plus pages long. He was examined thoroughly and at length by an experienced attorney in the course of that deposition. He was challenged on key points in the deposition. The appellant focuses on, well, how did this physical confrontation begin? How did the physicality of it start? Because it was the appellant's point that that was instigated by Deputy Wynn. And so this moment where the search of the decedent became confrontational and physical, was to the appellant's mind a key point. And as to that, all the other evidence on the subject was that the decedent started the fight. And that came from the statements that these eyewitnesses gave to the Missouri State Highway Patrol the evening of the occurrence. It would be the kindest way I could put it to say that these witnesses modified their statements when they gave depositions and testified at the trial. Two testified live, one testified by deposition. But in each case, these witnesses were confronted by the prior testimony that they had given, either that they admitted they did not see exactly how the confrontation began, or when they did see it, they said the decedent was the one who instigated it. Started fighting with the officer, rayed a fist and went to hit the officer with his elbow. And so the jury heard the evidence, as the court pointed out a moment ago, about exactly how this confrontation started. And that the plaintiff contends, well, the evidence ought to have been that Wynn started it. Well, that wasn't exactly how the evidence came out at the trial. The original statements given by the eyewitnesses, the Taco Bell employees, were equivocal on that point. Either they didn't see it or they agreed that the decedent was the one who started it. And so the evidence of Wynn on that point was somewhat cumulative. It wasn't the only evidence on the point. And let's face it, this was a hotly contested matter where the facts were different, interpreted differently by each party. But the jury heard all that evidence, and then the plaintiffs were allowed to counter-designate and any portion of the deposition that the plaintiffs wanted to read was read. Eventually, almost all of it was read, except parts that both of us agreed shouldn't be heard. And at the end of the day, I think the court, Judge Limbaugh, made the call that, out of fairness to everybody, the defendants who were present and who obviously had nothing to do with the absence of Deputy Wynn from the trial, as well as simply having the whole story told in the best way that it was possible under the circumstances that the circumstances justified the admission. Let me ask you, this deposition in this case, you agree it was a discovery deposition? Those distinctions, Your Honor, in Missouri don't really have the same meaning as they might in other jurisdictions. So you're saying this is a deposition that was taken to find out what the witness knew rather than to present the key points for trial? There's no question that it was in the nature of a discovery deposition, but I would say that in light of the fact that Missouri law doesn't treat them any differently, believe me, there was plenty of hard questions asked in that deposition. Depositions have hard questions. That's not my point. I'm just wondering when it was offered, when you offered it, did the defense, I mean the plaintiff, offer anything in rebuttal? Indeed. I submitted the portions I suggested should be read because one point the court would agree, if you looked at how the designations proceeded, they weren't linear. In other words, we didn't start at page 1 and end at page 162 because you get into the background of the witness, his description of the initial encounter, as the matter went forward, who saw what when and did what when. That didn't quite come out in the deposition in a linear fashion. And so we designated our portions, and the plaintiff designated substantial portions in addition to be read, all of which was heard. Did they read them separately? Did they have their own person? Did you put somebody in the stand to read it? No. As I'm standing here right now, I stood there and read our part, and then I read their part. Oh, you read both parts. Yes, sir. Okay. How did that work? It was about as interesting as you'd think it would be to stand listening to anybody talk for 40 minutes. I was, of course, I thought it went great, but I'm not sure everybody else felt that way. Okay. Thank you very much. Okay. Mr. Turley, we'll give you one minute. All right. The questions you directed to me were primarily focused on the matter of prejudice, but left me little or no time to discuss the abuse of discretion part of this, which is the part of it. The rules say that you can't use hearsay testimony. That's what a deposition is. There's exceptions to it, and the exceptions asserted by counsel at the trial was that he's more than 100 miles away, and I said I'll stipulate to that, and that he didn't procure his absence himself. And I said, well, I don't stipulate to that. Where's the evidence? And there was none. And the absurdity that he didn't procure his own absence is patent. He was not a member of the United States military, as maybe you didn't understand from this. He is employed by some contractor like Halliburton or, you know, one of those. And so he took a job there, and he did it voluntarily. So he was beyond the reach of a subpoena, right, at that time in Afghanistan? Well, yeah. He couldn't subpoena himself. Well, maybe he could. I don't know. But the point of subpoena, the beyond the reach of subpoena stuff, is obviously dedicated to the proposition. What if he did come here, and he was right here in time, decided he didn't want to come to trial? What if he didn't? Yeah, what if he were in St. Louis at the time of trial and decided, I'm not coming in the courtroom? Well, what I argue should be the same result. His deposition can't be used if he doesn't show up at trial. Well, did you want to put him on the stand? I did. Okay. But he could have avoided that by just not showing up, even if he were here. Well, the counsel, by their disclosure, said that he would be there. I'm just giving you the hypotheticals. Okay. Well, that's the thing. All these rules that we have to comply with say things like, who are you going to produce? And they said, when? And the thing is, the fact that counsel finds out that his client is incoming because he didn't have enough leave or that he didn't get started soon enough is an indication in and of itself that the guy procured his absence by his own hand. He could have if he wanted to and planned to. He just didn't get it worked out very well, apparently. But counsel didn't even testify to that or tell the court that in the proceedings. So there is zero evidence from which the trial judge could extrapolate some exceptional circumstances, which, incidentally, defense counsel never asked him to do. They asked him to allow it under another part of the rule. Judge Limbaugh just pulled that one out, and the rule says give a motion and notice to the other side of your intention to do so. I also have, did he ever talk about Federal Rule of Evidence 804B1? You know, those numbers just don't penetrate my- Well, that talks about using prior testimony also, that probably he may have done enough- Oh, oh, sure. Findings to- No, he didn't. Trigger that. No, he didn't. And if you read that rule, if that's what I'm thinking of, is it still has that procurement problem. You have to, and the witness has to be unavailable, and you have to show that his absence was not as a result of his own procurement. Well, when you're a party to a case and you tell everybody you're going to be there and you don't, and the reason counsel tells us now that you don't is because you didn't take off in time, and you didn't save enough leave from your job, well, that seems to me like he indeed did procure his absence. Okay, time's expired. Thank you. Thanks, Judge. Well, thank you both for your arguments. We will take it under advisement and be back in due course. Thank you. Thank you.